Record Nos. 21-13131, 21-13133, 21-13135

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

3M CO., ET AL.,

*Defendants-Appellants*

v.

LUKE ESTES, STEPHEN HACKER, AND LEWIS KEEFER

*Plaintiffs-Appellees*

On Appeal from the United States District Court
for the Northern District of Florida

**PLAINTIFFS-APPELLEES' RESPONSE BRIEF**

Noah Heinz
KELLER POSTMAN LLC
1100 Vermont Ave.
NW Fl. 12
Washington, DC 20005


David Cooper
QUINN EMANUEL
URQUHART & SULLIVAN
LLP
51 Madison Ave. 22nd Fl.
New York, NY 10010

O. Carter Snead
Professor of Law
University of Notre
Dame*

Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Rd. 6th Fl.
Ridgefield Park, NJ
07660

Michael Sacchet
CIRESI CONLIN LLP
225 S. 6th St. Suite 4600
Minneapolis, MN 55402

Ashley Keller
*Counsel of Record*
KELLER POSTMAN LLC
2800 Ponce De Leon Blvd.,
Suite 1100
Coral Gables, FL 33134
ack@kellerpostman.com
(312) 741-5222

Bryan F. Aylstock
AYLSTOCK WITKIN KREIS &
OVERHOLTZ, PLLC
17 E. Main St. Suite 200
Pensacola, FL 32502

June 27, 2022                                                *Counsel for Plaintiffs-Appellees*

---

* Institutional affiliation listed for identification purposes only.

*3M Co. v. Estes*
Record No. 21-13131

## CERTIFICATE OF INTERESTED PERSONS

Under Eleventh Circuit Rule 26.1-1, counsel for Plaintiffs-Appellees hereby certifies that the Certificate previously filed by Defendants-Appellants is complete and correct, with the addition of the following:

- Ashley Keller – (counsel for Plaintiffs-Appellees)
- Noah Heinz – (counsel for Plaintiffs-Appellees)
- Keller Postman LLC – (counsel for Plaintiffs-Appellees)
- O. Carter Snead – (counsel for Plaintiffs-Appellees)

Dated:  June 27, 2022                    Respectfully submitted,

                                         */s/ Ashley Keller*
                                         Ashley Keller
                                         KELLER POSTMAN LLC
                                         2800 Ponce De Leon Blvd.,
                                         Suite 1100
                                         Coral Gables, FL 33134
                                         ack@kellerpostman.com
                                         (312) 741-5222

                                         *Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees (the Veterans) respectfully request oral argument.  The motion practice and trial below were procedurally, factually, and legally complex.  Oral argument may help this Court fully understand the issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS........................................................................................ ii

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION ...................................................................................................1

STATEMENT OF THE ISSUES.............................................................................3

FACTUAL BACKGROUND...................................................................................3

      A.     Aearo and ISL Designed the CAEv2. ....................................................4

      B.     The Military Purchased CAEv2 as a Stock Product. ............................6

      C.     Aearo Belatedly Tested Its Design, Revealing "Problems.".................7

      D.     3M's CAEv2s Failed to Protect Soldiers' Hearing Because They Have Multiple Defects. ..........................................................................9

      E.     Aearo Never Told the Military About the Defects Revealed by the Flange Report. ....................................................................................10

      F.     Each Plaintiff Served Honorably in the United States Army, Where 3M's Earplugs Failed to Protect His Hearing. ........................13

PROCEDURAL BACKGROUND.........................................................................15

      A.     Judge Rodgers Ruled that the Government Contractor Defense Does Not Apply...................................................................................16

      B.     The Court Upheld Estes' and Keefer's Negligence *Per Se* Count......17

      C.     The Veterans Prevailed at Trial.........................................................17

SUMMARY OF THE ARGUMENT .....................................................................19

STANDARD OF REVIEW ...................................................................20

ARGUMENT ......................................................................................21

I.    The District Court Correctly Held That the Government Contractor Defense Does Not Bar the Veterans' Claims. ...............................21

    A.    3M Waived Any Argument That the Government Contractor Defense Applies Beyond Design-Defect and Failure-to-Warn Counts.......................................................................................21

    B.    The Government-Contractor Defense Does Not Apply to Design-Defect or Failure-to-Warn Because There Is No Uniquely Federal Interest in the CAEv2's Design or Warnings.....................................25

        1.    *The defense fails because 3M's state-law failures did not flow from its contractual performance.* ....................................25

        2.    *No prior case has found a uniquely federal interest without relevant contractual language.* ................................27

    C.    There Is No Significant Conflict Between Any Purported Federal Interest and State Design-Defect Law....................................29

        1.    *No reasonably precise government-approved CAEv2 specifications exist.* ....................................................29

            a.    *The only written specifications do not conflict with state law.* ........................................................31

            b.    *The unwritten materials 3M identifies are not reasonably precise specifications and do not address the defects at issue.* ........................................32

        2.    *There is no evidence that the military substantively reviewed—let alone approved—CAEv2 specifications.* ..........35

    D.    There Is No Significant Conflict Between Any Purported Federal Interest and State Failure-to-Warn Law.............................37

E.    3M Also Failed the Second and Third Prongs, but This Court Should Not Reach Them. ................................................... 39

II.    3M's NCA Argument Provides No Basis to Vacate the Judgment .............. 40

A.    This Court Lacks Jurisdiction to Set Aside EPA's Regulations. ........ 41

B.    The Combat Use Exception Does Not Apply. .................................. 42

1.    *Under the plain text, "equipment" does not cover earplugs*.... 43

2.    *EPA's interpretation was reasonable.* ...................................... 46

C.    The Court Need Not Review This Issue Because Other Counts Support the Verdict. ..................................................................... 47

III.    None of 3M's Evidentiary Nitpicks Warrant a New Trial. .......................... 49

A.    Admitting the Air Force Memo and CID Report Was Proper. ........... 50

1.    *Air Force Memo.* .......................................................................... 50

2.    *CID Report.* .................................................................................. 51

B.    The District Court Properly Admitted Evidence of ARC-Testing Issues. ............................................................................................... 54

C.    The Court Issued a Proper Curative Instruction Regarding Other Soldiers' Use of CAEv2s. ................................................................ 55

CONCLUSION ................................................................................................ 57

CERTIFICATE OF COMPLIANCE .............................................................. 58

CERTIFICATE OF SERVICE ........................................................................ 59

iv

# TABLE OF AUTHORITIES[*]

**Cases**                                                                 **Page(s)**

*Abreu v. United States*,
    468 F.3d 20 (1st Cir. 2006)................................................................43

*Am. Bankers Ins. Grp. v. United States*,
    408 F.3d 1328 (11th Cir. 2005) ........................................................20

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005)...........................................................................23

*Bearint ex rel. Bearint v. Dorrell Juv. Grp., Inc.*,
    389 F.3d 1339 (11th Cir. 2004) ........................................................55

*Beech Aircraft v. Rainey*,
    488 U.S. 153 (1988)...........................................................................52

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988).................................................................. *passim*

*Brinson v. Raytheon Co.*,
    571 F.3d 1348 (11th Cir. 2009) ................................................. 27, 34

*Caradigm USA LLC v. PruittHealth, Inc.*,
    964 F.3d 1259 (11th Cir. 2020) ........................................................55

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)...........................................................................42

*Conley v. Nw. Fla. State*,
    145 F. Supp. 3d 1073 (N.D. Fla. 2015) ............................................42

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001).............................................................................38

*Dorse v. Eagle-Picher Indus., Inc.*,
    898 F.2d 1487 (11th Cir. 1990) ................................................. 16, 37

---

[*] Asterisks indicate authorities upon which the Veterans principally rely.

*Dowd v. Textron, Inc.*,
    792 F.2d 409 (4th Cir. 1986) .................................................................35

*Edwards v. Bd. of Regents of Univ. of Ga.*,
    2 F.3d 382 (11th Cir. 1993) ...................................................................24

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ...............................................................................46

*FCC v. AT & T Inc.*,
    562 U.S. 397 (2011) ......................................................................... 45, 46

*\*Glassco v. Miller Equip. Co.*,
    966 F.2d 641 (11th Cir. 1992) ...............................................................37

*\*Goldsmith v. Bagby Elevator Co.*,
    513 F.3d 1261 (11th Cir. 2008) ....................................................... 24, 47

*\*Gray v. Lockheed Aeronautical System Co.*,
    125 F.3d 1371 (11th Cir. 1997) ..................................... 30, 34, 36, 37

*Griffin v. United States*,
    502 U.S. 46 (1991) .................................................................................24

*Guedes v. A.T.F.*,
    920 F.3d 1 (D.C. Cir. 2019) ..................................................................42

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ...............................................................................43

*Harduvel v. General Dynamics Corp.*,
    878 F.2d 1311 (11th Cir. 1989) .............................................................36

*Horton v. Union Light, Heat & Power Co.*,
    690 S.W.2d 382 (Ky. 1985) ...................................................................54

*In re Agent Orange Prod. Liab. Litig.*,
    517 F.3d 76 (2d Cir. 2008) ....................................................................27

*In re Hawaii Fed. Asbestos Cases*,
    960 F.2d 806 (9th Cir. 1992) .................................................................28

*Johnson v. Barnes & Noble Booksellers, Inc.*,
  437 F.3d 1112 (11th Cir. 2006) ............................................................56

*Kleemann v. McDonnell Douglas Corp.*,
  890 F.2d 698 (4th Cir. 1989) ...............................................................30

*Lewis v. Babcock Indus.*,
  985 F.2d 83 (2d Cir. 1993).....................................................................35

*Liberty Lincoln-Mercury v. Ford Motor Co.*,
  134 F.3d 557 (3d Cir. 1998).................................................................22

*Mais v. Gulf Coast Collection Bureau, Inc.*,
  768 F.3d 1110 (11th Cir. 2014) ..........................................................42

*McDonnell v. United States*,
  579 U.S. 550 (2016)..............................................................................43

*\*MidlevelU, Inc. v. ACI Info. Grp.*,
  989 F.3d 1205 (11th Cir. 2021) ................................................ 21, 47, 49

*Mu Ying Wu v. U.S. Att'y Gen.*,
  745 F.3d 1140 (11th Cir. 2014) ..........................................................23

*O'Melveny & Myers v. FDIC*,
  512 U.S. 79 (1994)................................................................................25

*Prather v. Abbott*,
  Lab'ys, 960 F. Supp. 2d 700 (W.D. Ky. 2013)....................................54

*Ramey v. Martin-Baker Aircraft Co.*,
  874 F.2d 946 (4th Cir. 1989) ...............................................................35

*S. Grande View Dev. Co., Inc. v. City of Alabaster*,
  1 F.4th 1299 (11th Cir. 2021) ..................................................... 21, 48

*Schwarz v. City of Treasure Island*,
  544 F.3d 1201 (11th Cir. 2008) ..........................................................28

*Smith v. RJ Reynolds Tobacco Co.*,
  880 F.3d 1272 (11th Cir. 2018) ..........................................................21

vii

*Trevino v. General Dynamics Corp.*,
    865 F.2d 1474 (5th Cir. 1989) ...............................................................36

*United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki*,
    358 U.S. 613 (1959)...............................................................................24

*United States v. Almanzar*,
    634 F.3d 1214 (11th Cir. 2011) .............................................................54

*United States v. Barton*,
    909 F.3d 1323 (11th Cir. 2018) .............................................................49

*United States v. Colston*,
    4 F.4th 1179 (11th Cir. 2021) ...............................................................48

*United States v. Dickerson*,
    248 F.3d 1036 (11th Cir. 2001) .............................................................49

*United States v. Steed*,
    548 F.3d 961 (11th Cir. 2008) ...............................................................47

*Yates v. Pinellas Hematology & Oncology, P.A.*,
    21 F.4th 1288 (11th Cir. 2021) ..............................................................50

**Statutes**

5 U.S.C. § 706................................................................................................41

42 U.S.C. § 4901............................................................................................45

*42 U.S.C. § 4902............................................................................................43

42 U.S.C. § 4905............................................................................................45

42 U.S.C. § 4907............................................................................................44

42 U.S.C. § 4911............................................................................................41

*42 U.S.C. § 4915............................................................................................41

**Regulations**

40 C.F.R. § 211.201.......................................................................................40

*40 C.F.R. § 211.203 ................................................................40

40 C.F.R. § 211.204-1 ............................................................41

40 C.F.R. § 211.204-3 ............................................................39

40 C.F.R. § 211.204-4 ........................................................ 39, 41

40 C.F.R. § 211.206-1 ............................................................41

40 C.F.R. § 211.211 ...............................................................41

40 C.F.R. § 203.1 ..................................................................46

*40 C.F.R. § 211 ...................................................................46

48 C.F.R. § 11.107 ..................................................................7

48 C.F.R. § 52.211-6 ...............................................................7

48 C.F.R. § 53.213 ..................................................................6

**Other Authorities**

Fed. R. Evid. 803 ..................................................................51

## INTRODUCTION

After a five-week trial, a jury unanimously found 3M liable for negligently and fraudulently selling its defective Combat Arms Earplugs Version 2 to three Army soldiers: Luke Estes, Lewis Keefer, and Stephen Hacker. The evidence at trial showed 3M failed to test its CAEv2s until 2000, *after* it began selling them to the military. When it did, 3M discovered the earplugs loosened imperceptibly and did not properly fit the human ear. Soldiers wearing the CAEv2 would believe they were protected while suffering serious hearing damage. 3M threw out its test results and retested using a never-before-used method of folding back the flanges. An internal report detailed the problems, but 3M concealed it.

3M never disclosed the CAEv2's risks. For years, it sold the earplugs with no label, warnings, or instructions. *Civilian* packaging suggested *some* users may prefer to fold the flanges back for a better fit, never warning that the earplug was much less protective and would loosen otherwise. Most soldiers never learned this tip. Military manuals and 3M's own sell sheets did not include it. The day after its internal report came to light, 3M stopped selling the earplugs and stated the protection level was incorrect.

After learning the truth, the government sued under the False Claims Act. The jury below found the same thing the United States alleged: fraud and fraudulent concealment. The jury found 3M's conduct was intentional, warranting punitive

1

damages, and separately found 3M liable for negligence, design defect, failure-to-warn, breach warranty, and related counts. 3M does not dispute that sufficient evidence supports *each* of these counts and the damages awarded. 3M barely mentions the fraud and warranty counts, and cannot evade liability by pretending these jury findings do not exist.

3M's principal argument is the government contractor defense, but multiple independent reasons preclude applying that defense: the military never approved the CAEv2's design, there were no design specifications, and there certainly were no specifications prohibiting a warning. Even if the defense applied to design-defect and failure-to-warn claims, 3M waived any argument to extend it beyond those claims. The defense plainly does not apply to other counts, and it would be absurd to suggest that the government required 3M to commit fraud, which is the only way refraining from committing fraud would conflict with federal law.

3M's other arguments also fail. EPA regulations plainly apply to the CAEv2, and 3M provides insufficient reason to nullify them—and this Court has no jurisdiction to do so. Even if the regulations do not apply, any error was harmless since the Veterans proved liability multiple different ways, any one of which fully supports the judgment. With so many independent bases for affirmance, this appeal is not, as 3M would have it, a story of Hamlet without the Prince, but a futile attack

on an unimpeachable judgment: "a tale … full of sound and fury, signifying nothing." W. Shakespeare, *Macbeth*, Act V, scene 5, lines 26-28.

## STATEMENT OF THE ISSUES

**1.** Whether the government contractor defense applies to every count where 3M waived it as to most counts and, for design-defect and failure-to-warn, pointed to no relevant contract and no specifications requiring the design-defects at issue or the absence of a warning.

**2.** Whether this Court has jurisdiction to set aside EPA hearing protective device regulations, the regulations are contrary to the Noise Control Act, and supposed instructional error on this issue substantially prejudiced 3M where the jury found liability on counts to which the instructions do not apply.

**3.** Whether the district court abused its discretion and prejudiced 3M in evidentiary rulings.

## FACTUAL BACKGROUND

The CAEv2 is a two-sided, single-size earplug, pictured below.[1]

---

[1] P-GEN-107 at 2.



A stiff stem goes through the center, with flexible appendages called "flanges" attached. The dark side blocks or dampens all noises equally, like conventional earplugs. The yellow side has a non-linear sound filter to let low-level sounds through (like conversation), but block sudden loud sounds (like gunshots).

### A. Aearo and ISL Designed the CAEv2.

Until this litigation, 3M and Aearo[2] claimed the CAEv2 was "developed jointly" with the French-German Research Institute of Saint-Louis (ISL), PX68 at 1,[3] with Elliott Berger as its "inventor," PX14 at 2. *See also* PX11(Knauer-85:22-25). ISL invented the filter and Aearo the single-sided Ultrafit earplug. Because users often also need a standard earplug, ISL and Aearo patented a two-sided earplug, with the non-linear filter on one side. PX6.

---

[2] 3M owns the Aearo entities.
[3] "PX" or "DX" means Plaintiffs' or Defendants' Exhibit to their government contractor briefing.

4

On December 16, 1997, Army officials, including the civilian manager of the Hearing Conservation Program, Dr. Doug Ohlin, met with ISL and Aearo to discuss the earplug and told them the Army was "interested in [a] 2-ended plug" for practical reasons.  DX2 at 3-4.  After this meeting, Aearo made 25 sample 2-sided earplugs and sent them, unprompted, to Ohlin in March 1998.  Aearo never sent design drawings to Ohlin.  Ohlin did not respond or react for thirteen months. On April 6, 1999, he requested that the Army enlarge the standard-issue carrying case to fit Aearo's samples.  PX72 at 2.  Still trying to close the sale, Aearo Senior Marketing Director Brian Myers suggested a different solution: "I spoke with Dick Knauer who believes that we can probably shorten the plug by the 1/4" required to fit your current container."  DX3 at 1.  Ohlin was receptive because "the plug [was] too long for the case," and his "green suit friends [told him] it sticks out too far for the kevlar combat helmet," which was "a show stopper."  DX4 at 2.

Aearo convened an internal "design review meeting," with samples and design drawings to discuss "reducing the length by ¼ of an inch."  DX17 at 3.  The Aearo team moved fast.  By April 27, 1999, they had new design drawings that were the "same" as a previous "drawing … except: trim off stem flush with large flange."  DX14 at 2.  Aearo reduced the stem length by .184", not the .25" proposed to Ohlin.  *Compare* DX14 at 10 ("1.588") *with id.* at 11 ("1.404").  Aearo sent the redesigned earplugs to Ohlin—again without technical drawings.  On May 12, Ohlin wrote that

5

"Aearo[] got back to us with acceptable production samples."  DX3 at 4.  Ohlin submitted a Request for National Stock Number (NSN) and Bulk Purchase of Combat Arms Earplugs.  DX9.

### B. The Military Purchased CAEv2 as a Stock Product.

The military's first purchase was in August 1999.  PX47 at 001.  Ohlin sent the Navy basic directions on the CAEv2, never mentioning that the flanges should be folded back.  DX15.  The first procurement contract was in 2006 on Standard Form 1449, PX37 at 2, PX10 at 804-13, which is a "simplified acquisition procedure[]" for "commercial products."   48 C.F.R. §53.213.   This form incorporated basic specifications by reference:

```
SECTION C-DESCRIPTION/SPECIFICATION
ITEM IDENTIFICATION
PLUG, EAR, COMBAT ARMS, DOUBLE-ENDED, 50 PAIR:
SWEPT-BACK TRIPLE-FLANGE STYLE. OLIVE DRAB END
PROTECTS USER FROM CONTINUOUS NOISE; YELLOW END
PROTECTS  USER  FROM  MILITARY  WEAPONS  NOISE.

SHALL   BE   IN   ACCOR[D]ANCE   WITH   MEDICAL
PROCUREMENT ITEM DESCRIPTION NO. 2 DATED 16 JULY
2006.

PRESERVATION, PACKAGING, PACKING LABELING AND
MARKING   FOR   6515-01-466-2710   SHALL   BE   AS
SPECIFIED   IN   MEDICAL   PROCUREMENT   ITEM
DESCRIPTION NO. 2.
```

PX37 at 35.  The Medical Procurement Item Description Number 2 (MPID) called for "Aearo Corporation's P/N 370-1000, or equal.  'Equal' items shall possess the

salient characteristics as specified herein." PX37 at 41.[4] It authorized the "Contracting Officer" (not Ohlin) to "evaluate 'equal' products." PX37 at 49. None of the "salient characteristics" involve the design features at issue (stem length, width, flexibility, or flange location), though the MPID mandated that 3M include "instructions explaining the proper use and handling of the ear plugs" specifically "on a suitable sheet of paper which shall be placed *inside* the unit package" or "*on* the unit container." PX37 at 41-42 (emphasis added).

Aearo sold "feature identical" earplugs to civilians. PX19 (30(b)(6)-38:13-40:15, 51:5-24). Records show sales to non-military buyers by January 2000. PX47 at 001. According to Ohlin, "There is no DOD specification for the combat arms earplug." PX53.

## C. Aearo Belatedly Tested Its Design, Revealing "Problems."

Though Aearo had been selling CAEv2s to the military since August 1999, Aearo's scientist and "inventor of the combat arms ear plug," PX14 at 3, Elliott Berger, noted in mid-November 1999 that "[i]t recently occurred to us that we have no data on the actual version of the nonlinear earplug that we are now selling in the US." PX20. Technician Ronald Kieper conducted a test called Real-Ear Attenuation

---

[4] "Brand Name or Equal" is defined in 48 C.F.R. §§11.107(a), 52.211-6. There are no applicable "Government-Unique Standards" in this case.

at Threshold (REAT), which is the test required by EPA regulations and ANSI[5] §3.19 to evaluate the Noise Reduction Rating (NRR) of hearing protection. *See* PX22; PX29 (same). NRR is the yardstick for hearing protection—ubiquitous and standardized. It measures hearing-protection efficacy under ideal conditions. The original Ultrafit earplug had an NRR in the twenties, which is what the military assumed CAEv2s had too. *See* PX26 (Berger-559:5-13); PX11(Knauer-117:10-17).

In Berger and Kieper's first test, the conventional side was earning an NRR of 11, which is "quite low," DX24 at 3—bad enough that Berger ordered "[t]esting stopped after 8 subjects" when the test protocol required 10. *Id.*; *see also* DX21. Because NRR is a logarithmic scale (like the Richter Scale), halving the NRR blocked about one *tenth* the sound.

Berger and Kieper performed another test on the conventional side, but this time the "flanges were folded outward to allow a deeper insertion." PX29 at 5366. The NRR was hitting 20, so they completed the test, calculating an NRR of 22. *Id.* at 5365. Berger emailed Myers the results on May 12, 2000, flagging that "the existing product has problems." PX32. He explained, "the original study was stopped with 8 subjects" and "[t]he second study was with the folded back flanges." PX32. Berger and Kieper drafted the Flange Report on July 10, 2000, detailing those

---

[5] The American National Standards Institute is a non-governmental organization that accredits and recognizes voluntary consensus standards for hearing protection.

problems with the CAEv2, and claiming that folding back the flanges largely solved those problems.  DX24.  3M never retested the non-linear side by folding the flanges back, meaning the different sides were tested under different protocols.

### D. 3M's CAEv2s Failed to Protect Soldiers' Hearing Because They Have Multiple Defects.

On appeal, 3M does not dispute that the CAEv2 was defective *and* that 3M knew of the defects.  The Veterans proved at least three defects.

*First*, as the Flange Report itself described,"[w]hen the inward pressure on the plug was released, the yellow plug's flanges tended to return to their original shape and this sometimes loosened the plug, often imperceptibly to the subject."  DX24 at 3.  Normally, a user can assess an earplug's seal based on volume, but loosening is "imperceptible" on the non-linear side "because the acoustic cues are coming through that you would use to determine that it had come loose."  3/30/21 Tr. 196:8-10 (McKinley).  3M's own testing showed "even in the laboratory that the earplugs were coming loose" over periods of just "eight minutes."  3/31/21 Tr. 81:8-20.  *See also, e.g.*, 4/8/21 Tr. 157:14-21, 158:11-13, 163:24-164:16 (Kieper).

*Second*, the Flange Report noted the "plug is too short for proper insertion," and "the plug is so short, it was difficult for the experimenter to insert the plug deeply into some subjects' earcanals, especially those subjects with medium and larger earcanals."  DX24 at 3.  Both authors re-confirmed that finding at trial.  4/8/21 Tr. 163:8-19 (Kieper); 4/19/21 Tr. 313:2-4 (Berger: "To get a consistent optimum fit

across all of the subjects, which is our goal when we conduct a test ANSI §3.19, it would be too short to achieve that."). *See also, e.g.*, 3/30/21 Tr. 203:2-5, 3/31/21 Tr. 123:11-15 (bioacoustical expert McKinley).

*Third*, the stem was too stiff and thick. The human "ear canal itself is not a straight shot. It's unlikely that [anyone has] a straight, just cylindrical ear canal…." 4/7/21 Tr. 178:12-19 (McKinley). Aearo heard that complaint about its prototype in 1997, when Armand Dancer from ISL emailed Berger about the "diameter of the prototype plug because of the surrounding stem." To address "fitting problems," he asked them "to reduce the overall diameter of the stem and of the plug (the prototype plug is actually too big)?" P-GEN-251. Instead, Aearo made the "fitting problems … worse," increasing the diameter "from 4.2 [mm] to 4.45 [mm]." 3/30/21 Tr. 210:15-22, 212:12-19.

### E. Aearo Never Told the Military About the Defects Revealed by the Flange Report.

3M concedes it *never* sent the Flange Report to the military, *e.g.*, PX80 (Berger-206:12-13)—a damning fact it obscures by claiming, "Aearo told the military about the flange report's *conclusions*." Op.Br. at 38 (emphasis added). But the only "conclusion" 3M contends reached the military is a "fitting tip," Op.Br. at 9, based on three tenuous facts: 1) a wallet card suggested, "For very large ear canals, fold opposing plug back," DX41 at 2; 2) a single witness recalled that Ohlin may have said "if you needed to, you could fold back the flange on the earplug [to] get a

10

good fit," Op.Br. at 39; and 3) supposedly, Berger sent a copy of the NRR-22 test results (not the Report) which contained, hidden in small text on page 4, the obscure words "flanges were folded outward to allow deeper insertion." DX23 at 4.[6] None of these disputed facts establish that Aearo warned the military about the defects. A "fitting tip" is at most a suggestion, not a warning. It does not mention the *dire consequences* of not following the "tip."

The military plainly did not comprehend the "conclusions" of the Flange Report. A 70-page official Army Manual ("Training Guide 41") titled "Personal Hearing Protective Devices Their Fitting, Care and Use" discussed the CAEv2 in detail in multiple sections. PX64 at 13-16, 30-31. The manual cited testing from *1995*, apparently unaware that the changes Aearo made in 1998-99 meant that testing was inapplicable. PX64 at 15 & n.10. The manual had an entire chapter on the importance of fit and included specific instructions and pictures about the CAEv2 that show insertion *without* folding flanges back:

_____

[6] 3M claims "military audiologists" knew flanges should be rolled back, and quotes "one audiologist," Op.Br. at 10, that parrots its litigating position without noting that the source is a *3M employee* who submitted a made-for-litigation declaration. As the Veterans protested below, this is improper, inadmissible evidence because it sidesteps the *Touhy* process for testimony by former federal employees, without which there is no authorization to testify. Dkt.1089 at 9 n.5. The district court did not reference this improper declaration in its summary judgment order.

**Proper and Improper Fit of the Double-Ended Combat Arms Earplug** (Figures 53 and 54, respectively)**.**




*Figure 53*                     *Figure 54*

*Proper (left) and Improper (right) Insertion of the Double-Ended Combat Arms Earplug*

PX64 at 31. The manual nowhere mentions folding flanges. 3M cites military testing between 2001 and 2015, but none of that testing used folded flanges, which is inexplicable if Aearo told the military the "conclusions" of the Flange Report. *See* DX7, DX45-52 (cited in Op.Br. at 12).

3M discontinued the CAEv2 *the day after* disclosing the Flange Report as a deposition exhibit. PX31 at 4 (Oct. 7, 2015 deposition); PX38 (Oct. 8, 2015 email: "Please cease shipping immediately"). Following that disclosure, the government intervened in a False Claims Act suit against 3M, alleging that "3M, and its predecessor Aearo, knew that the CAEv2 was too short for proper insertion in users' ears and, therefore, did not perform as well in certain individuals. Additionally, the United States alleges that 3M did not disclose this information to the United States and delivered the CAEv2 to the United States knowing that the product contained

12

defects that impaired the CAEv2's serviceability." *United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, 3:16cv1533, ECF.No. 23-1 ¶C (D.S.C. May 12, 2016). 3M settled for $9,100,000; the government did not withdraw its allegations. *Id.*

The United States conducted "numerous interviews and record reviews" on "the testing results and the contracting process" for the CAEv2. P-GEN-0009 at 2. The conclusion: "[H]ad they known about the February 2000 test results (i.e. that the CAE was too short for proper insertion in the users' ears and, therefore, did not perform well in certain individuals) on the CAE they may not have purchased the items." *Id.* Defendants put an excerpt of the Investigation Report into the record as DX13. Unsurprisingly, the Division Chief of the Army Public Health Center said "the manufacturer should have informed the military of this problem, so that the military could [have] advised the sold[i]ers of the slippage problem.… Because of the manufacturer's failure to inform, the US Government doesn't know what it is really receiving." DX13 at 4. The Air Force recalled the CAEv2 from inventory. P-GEN-2586.

**F. Each Plaintiff Served Honorably in the United States Army, Where 3M's Earplugs Failed to Protect His Hearing.**

Luke Estes served in the Army from 2008 through 2017, starting at West Point. 4/5/21 Tr. 4:20-23, 13-14. The Army issued Estes CAEv2s in 2009, which were his primary hearing protection through 2015. 4/5/21 Tr. 28:14-17, 75:19-21. He wore the CAEv2 "at the range shooting live rounds," including as a Tank

13

Commander at Fort Benning.  4/5/21 Tr. 31:2-11, 37-38.  In 2014 as "officer in charge" at the range, while he was "walking up and down the lines, the sounds from the shooters just really seemed really loud."  4/5/21 Tr. 73:6-10.  He checked his earplugs, but "they seemed to be in."  Later that day, he heard "an unbelievable amount of ringing in the ear."  4/5/21 Tr. at 73:10-12.  The ringing "didn't completely go away."  4/5/21 Tr. at 74:3-4.  In 2015, Army testing confirmed that Captain Estes had hearing loss in his left ear and tinnitus (ringing in the ears).  4/5/21 Tr. 80:25-82:18.  The ringing and hearing loss has worsened; at work, he must use emails or texts instead of phone calls; when he drives he cannot understand his daughter in the back seat. 4/5/21 Tr. 103:12-21, 128:11-129:3.

Lewis Keefer served in the Army from 2007 through 2015.  4/6/21 Tr. 170:17-20.  Keefer started at Fort Benning, using CAEv2s as his primary hearing protection.  4/6/21 Tr. 187:14-188:4.  When he joined, military testing suggested his hearing was normal, 4/6/21 Tr. 182:2-183:3, but Army tests in 2008 and 2009 showed significant hearing loss, 4/6/21 Tr. 200:9-201:8.  His CAEv2s in tow, Keefer deployed to Iraq in 2009 as a combat medic.  4/6/21 Tr. 201:23-204:3.  Back in America, he repeatedly failed military hearing tests and was diagnosed with hearing loss and tinnitus that progressively worsened.  4/6/21 Tr. 208:1-25.  At night, he lay awake, hearing "a loud buzzing, ringing constantly in [his] ears." 4/6/21 Tr. 215:23-25.  Now 41, he works as a police officer and endures "the fear of going deaf."  4/6/21

14

Tr. 225:9-11.  The ringing is "a constant, steady emergency broadcast system signal going off in my head at all times."  4/6/21 Tr. 225:19-24.

Stephen Hacker joined the Army in 1998 when he was seventeen and served for twenty years, with tours in Germany, Kosovo, South Korea, Kuwait, and Iraq (twice).  4/14/21 Tr. 55:9-17, 61:3-5, 72:8-74:20.  From 2002 through 2010, Hacker wore CAEv2s as his primary hearing protection.  4/14/21 Tr. 85:7-12.  Over that period, he maintained generators and worked at shooting ranges and in the motor pool.  4/14/21 Tr. 101:22-103:18.  Despite wearing earplugs, in 2006 he told a military audiologist that he heard ringing in his ears.  4/14/21 Tr. 110:18-112:25.  Hacker now works as a mailman, but "there is no quiet when you have tinnitus."  4/14/21 Tr. 131:18-132:9.  He always hears "a high pitch noise … like the feedback you'd get from a microphone going too close to your speaker," which sometimes "spikes … almost like ambulance-siren-loud in each ear."  4/14/21 Tr. 122:7-15.

On appeal, 3M does not challenge the jury's determination that the CAEv2 caused all three Veterans' hearing loss, tinnitus, or both.

## PROCEDURAL BACKGROUND

Estes, Keefer, and Hacker were among thousands of soldiers with hearing loss and tinnitus who filed suit against 3M.  The JPML consolidated all cases before Judge Rodgers in the Northern District of Florida.

15

**A. Judge Rodgers Ruled that the Government Contractor Defense Does Not Apply.**

After discovery, both sides moved for summary judgment on the government contractor defense. Dkt.1071, 1072.  3M moved *only* on "Design Defect Claims," Dkt.1071 at 23-32, and "Failure to Warn Claims," *id.* at 33-34.  Plaintiffs moved on those, plus "negligence, warranty, misrepresentation, fraud, gross negligence, negligence per se, and consumer-protection claims." Dkt.1072 at 11.  The district court granted Plaintiffs' motion in a thorough, well-reasoned decision.  Dkt.1280.

The court rejected the government contractor defense on a threshold question: "the uniquely federal interests underlying the creation of a federal common law defense in the context of federal procurement contracts … simply do not exist in the absence of a government contract."  Dkt.1280 at 29.  Alternatively, on the design-defect claims the court found no conflict between state and federal law because no "reasonably precise specifications" exist for the CAEv2.  Dkt.1280 at 34-49.  On failure-to-warn, the court found no conflict because no "specifications … contain any prohibition against health warnings on the product." *Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990).  The court found "no evidence—none—that the Army prohibited Aearo from warning of alleged dangers inherent in the use of the CAEv2."  Dkt.1280 at 53.  With two independent bases resolved, the court declined to reach factors two and three of the government contractor defense: whether the CAEv2s conformed to any specifications, and whether 3M warned the

16

government of the dangers. Last, the court granted Plaintiffs' motion on all other counts because "[d]efendants concede[d] that the defense applies only to design defect and failure-to-warn claims." Dkt.1280 at 55.

## B. The Court Upheld Estes' and Keefer's Negligence *Per Se* Count.

3M was negligent *per se* because the CAEv2's NRR value was false and misleading, and 3M failed to follow ANSI §3.19 testing procedure. 3M purported to follow ANSI §3.19, which was required both under the MPID and EPA regulations promulgated under the Noise Control Act (NCA). 3M argued the CAEv2 were designed for combat use, and so EPA regulations did not apply. The district court held that the combat use exception applies to loud things like guns, trucks, and so forth, not hearing protective devices. 3M makes much of various moments at trial it claims raised this issue again, but 3M failed to object at any of those moments. *See* Op.Br. at 18 (citing seven transcript pages with no relevant objection).

## C. The Veterans Prevailed at Trial.

At trial, 3M continued its fruitless attempt to blame the government, this time as a superseding cause, sophisticated intermediary, or one of the entities to whom the jury could apportion blame. After provisionally winning a motion *in limine* to exclude evidence of thousands of similar lawsuits, Dkt.1695 at 5-7, 3M nonetheless boasted that thousands of soldiers used the CAEv2 without incident. The Veterans

17

cross-examined 3M's witness on whether a "large number" of users reported hearing loss. 4/28/21 Tr. 107:19-108:3. After hearing the answer, the district court properly instructed the jury to consider only the three Veterans, not any other complaints (or good experiences). *Id.* at 111:1-8.

The quality-control lapses with 3M's acoustic resistance checker (ARC box) were directly relevant to the negligence claim, punitive damages, failure to warn, and to refute 3M's false claims of world-class quality. Dkt.1695 at 19; *Keefer*.Dkt.177 at 3-4; *Hacker*.Dkt.194 at 3-4; *Estes*.Dkt.175 at 3-4. 3M objected only under Rules 401 and 403 (not 404), and the district court properly denied the objection.

3M also argued the government knew all about CAEv2's defects, prompting the Veterans to introduce (and the district court to admit) an Air Force Memorandum, P-GEN-2586, and summary pages from a Criminal Investigative Command report, P-GEN-0009, which showed the military did not know about the defects. The district court gave careful limiting instructions not to consider the documents for their truth. *E.g.*, 4/1/21 Tr. 126:2-8, 130:15-131:8; 4/2/21 Tr. 230:24-231:21; 4/12/21 Tr. 303:22-34:4.

Hearing the extensive evidence, the jury returned a verdict for the Veterans on all counts. This included not only counts 3M challenges in this appeal (design-defect, failure-to-warn, and negligence *per se*), but also counts 3M has never

challenged (fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, breach of warranty). *Estes*.Dkt.184; *Hacker*.Dkt.202; *Keefer*.Dkt.186. The jury awarded compensatory and punitive damages.

## SUMMARY OF THE ARGUMENT

**I.** 3M cannot prevail on the government contractor defense because it waived the defense for most counts. 3M does not even mention the waiver or propose any argument for how the district court erred. Because any one count is sufficient to support the judgment, 3M's other arguments are immaterial.

Regardless, no uniquely federal interest exists here. Federal common law applies in rare circumstances, and the kind of strong governmental interest needed to create it is lacking where there is no contract addressing the state law duty in question. Here, there is no contractual term addressing the design or warnings of the CAEv2, and so no uniquely federal interest that could conflict with state-law duties.

If there were a uniquely federal interest, it would not conflict with state law because there are no reasonably precise specifications. The MPID says nothing about design and affirmatively requires warnings. If the specifications are supposed to be something else—Ohlin's emails or the samples—they fail both for lack of precision and because the military never reviewed or approved them. Even if the specifications were precise enough in some respects, nothing 3M points to addresses the defects at issue: the stem length, flange positioning, and stem width and

19

thickness.  And the government contractor defense does not apply to the failure-to-warn count because no specification required 3M not to warn.

**II.** The district court properly instructed the jury that EPA regulations govern the CAEv2 because the regulations by their terms apply to all hearing protective devices.  3M's attempt to nullify the regulation is jurisdictionally barred, defies the NCA's plain language, cannot overcome *Chevron* deference, and cannot overcome harmless-error review because the instruction applied to just one of many counts.

**III.** The district court's evidentiary rulings were correct.  3M never objected to the Air Force Memo as hearsay, and the court admitted it to allow the Veterans to rebut 3M's false—but repeated—claim that the military knew about the CAEv2's defects.  The CID report is admissible under Rule 803(8) as a summary of an investigation.  The acoustic resistance checker evidence was proper to show negligence, to rebut 3M's claims of excellence, and to support punitive damages. 3M itself put the number of complaints at issue, and cannot now seek reversal based on a proper curative instruction.  None of 3M's arguments plausibly show error, much less an abuse of discretion or prejudice given the jury verdict against 3M on all counts and the overwhelming evidence supporting it.

## STANDARD OF REVIEW

"This court reviews … cross-motions for summary judgment *de novo*, applying the same legal standards used by the district court." *Am. Bankers Ins. Grp.*

*v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court "review[s] jury instructions *de novo* to determine whether they misstate the law," "subject to harmless error review." *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1215 (11th Cir. 2021). Preserved objections to "[e]videntiary rulings are reviewed under an abuse of discretion standard," but "even a clearly erroneous evidentiary ruling will be affirmed if harmless." *S. Grande View Dev. Co., Inc. v. City of Alabaster*, 1 F.4th 1299, 1305 (11th Cir. 2021). Findings of waiver are reviewed for abuse of discretion. *Smith v. RJ Reynolds Tobacco Co.*, 880 F.3d 1272, 1280 (11th Cir. 2018).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT THE GOVERNMENT CONTRACTOR DEFENSE DOES NOT BAR THE VETERANS' CLAIMS.

The jury found 3M liable on numerous claims, each of which independently supports the judgment. Both below and here, 3M invoked the government-contractor defense only for design-defect and failure-to-warn claims. That double waiver is dispositive. Each unchallenged claim fully supports the verdict. The Court can affirm on that basis alone. If the Court nonetheless chooses to adjudicate the government-contractor defense, 3M's argument is meritless.

### A. 3M Waived Any Argument That the Government Contractor Defense Applies Beyond Design-Defect and Failure-to-Warn Counts.

The district court did not abuse its discretion when it found that 3M waived any argument that the government-contractor defense applies to the Veterans'

intentional torts, negligence *per se*, warranty, and misrepresentation counts.  In their motion for summary judgment, the Veterans included a full section arguing "**The Defense Is Irrelevant to the Vast Majority of Plaintiffs' Claims**."  Dkt.1072-1 at 10-11.  3M agreed: "Plaintiffs correctly note that the contractor defense applies only to design-defect and failure-to-warn claims."  Dkt.1088 at 39.  The district court accordingly found that "Defendants concede[d] that the defense applies only to design defect and failure-to-warn claims." Dkt.1280 at 55.  The district court then relied on that finding in declining to certify its summary judgment ruling for interlocutory appeal because it has "no impact on the vast majority of claims in this litigation."  Dkt.1329 at 11.  3M did not object to the finding of waiver or preserve any objection at trial.

3M cannot question the waiver finding now because its "briefs to this court do not challenge the waiver determination that the district court found dispositive." *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 573 (3d Cir. 1998). Moreover, 3M also forfeited the defense as applied to all but the design-defect and failure-to-warn claims in this Court by failing to present a substantive argument for applying it to those claims.  Its *only* argument is *ipse dixit* that the Veterans' "warranty, negligence *per se*, and misrepresentation claims all 'boil down to claims

of design defect … and failure to warn.'"  Op.Br. at 44.  This bald assertion—a single, conclusory sentence—is woefully inadequate to preserve the issue.[7]

Waiver and forfeiture aside, 3M's position is ludicrous.  Preemption applies duty-by-duty, not in gross.  The Supreme Court analyzes *particular* state-law duties in preemption cases to assess conflict with federal law.  *See, e.g.*, *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444-45 (2005) (remanding failure-to-warn claims to determine if state labeling requirements conflicted with federal law, but finding no preemption of express-warranty claims).  3M cites no case—and the Veterans are aware of none—that has *ever* applied the government contractor defense to claims based on fraud or misrepresentations.  That is no surprise.  No federal contract seeks to set aside state duties not to make intentional misrepresentations, negligently violate federal regulations, or disregard express warranties.

To take one example, the CAEv2 claimed an NRR of "22," which 3M knew was false.  Hacker purchased CAEv2s after reading the packaging, including the NRR.  4/14/21 Tr. 105:2-11, 157:9-15.  He relied on and suffered damages from that fraudulent misrepresentation and breach of express warranty.  3M has not challenged evidentiary sufficiency for those counts.  To show preemption, 3M would need to explain which CAEv2 specifications *required* 3M to perform inaccurate tests, then

---

[7] *See, e.g.*, *Mu Ying Wu v. U.S. Att'y Gen.*, 745 F.3d 1140, 1152 n.12 (11th Cir. 2014) ("Wu and Zhang have abandoned [their] claim … [by] mak[ing] only a one-sentence passing reference to this issue.").

put a false NRR of "22" on the CAEv2 label. 3M does not even attempt to meet that standard.

Under black-letter law, general verdicts stand if any theory could support the judgment. *Griffin v. United States*, 502 U.S. 46, 60 (1991). This Court applies that rule. In *Goldsmith v. Bagby Elevator Co.*, the jury found that the plaintiff's "termination was both based on race and retaliatory." 513 F.3d 1261, 1279 (11th Cir. 2008). Because "the jury was entitled to return a verdict for Goldsmith on his claim of retaliation and the jury awarded the same damages based upon both theories of wrongful termination, we need not address any issues about Goldsmith's alternative claim that his termination was based on his race." *Id.* at 1279-80 (citing *Edwards v. Bd. of Regents of Univ. of Ga.*, 2 F.3d 382, 383-84 (11th Cir. 1993)).

That reasoning controls here. The jury found for each Veteran *separately* on each count and awarded the same damages. *See* Estes Verdict (10 counts "proven," including "fraudulent misrepresentation," "fraudulent concealment," and "breach of express warranty"); Keefer Verdict (same); Hacker Verdict (7 counts "proven," including fraudulent misrepresentation and concealment).[8] Just as in *Goldsmith*, this

---

[8] Some midcentury cases required "a new trial" where "there is no way to know that the invalid claim … was not the sole basis" for the verdict, *United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619 (1959), but even if that principle survives *Griffin*, the verdict forms make clear the counts 3M challenges were not the verdict's "sole basis."

Court "need not address any issues about [the Veterans'] alternative claim" for design-defect and failure-to-warn.

## B. The Government-Contractor Defense Does Not Apply to Design-Defect or Failure-to-Warn Because There Is No Uniquely Federal Interest in the CAEv2's Design or Warnings.

If the Court reaches the merits, it should affirm.  Federal common law has a narrow compass, and 3M cannot invoke it here.

### 1. *The defense fails because 3M's state-law failures did not flow from its contractual performance.*

Federal common law is authorized only to protect "uniquely federal interests." Drawing on the established interests in the performance of government contracts and the immunity of federal officials for discretionary acts, the Supreme Court identified a "'uniquely federal' interest" in "civil liabilities arising out of the *performance* of federal procurement contracts."  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 505-06 (1988) (emphasis added).

That is hardly an endorsement of 3M's sweeping rule that *every* government procurement contract creates vast swaths of federal common law.  Op.Br. at 32-33. If that rule controlled, "we would be awash in 'federal common-law' rules." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994).  Instead, a uniquely federal interest must be rooted in contract *performance*, *Boyle*, 487 U.S. at 506, which turns on "the terms of Government contracts," *id.* at 507, not unwritten expectations, informal interactions, or vague resorts to public policy.  It follows that if no term of

25

a procurement contract even touches on the relevant state-law duty, there is no uniquely federal interest to undergird federal common law that could displace that duty.

The district court correctly applied that rule here. It held that there is no uniquely federal interest for designs or warnings because 3M has not identified *any* provision of its procurement contract that required it to design or warn in particular ways. In fact, *no* contract terms are material to 3M's argument—so much so 3M has not placed *any* procurement contract in the record. *See generally* Op.Br. App'x Vols. I-XIV. As the district court explained, "at the time Aearo designed the CAEv2, it had no procurement contract with the Army," and "[e]ven after the Army began using the CAEv2, there was no contract establishing, adopting, or even describing the design of the product." Dkt.1280 at 26.

3M surely kept its later purchase contract out of evidence because it knows that performance required little more than delivering product, much like any humdrum government contract to purchase paper or coffee. Unable to root a uniquely federal interest in contract performance, as *Boyle* requires, 3M points instead to a series of actions (chiefly, interest in the CAEv2 and looking at samples) followed by a series of sales. The missing element is some demonstrated connection between the terms of its sales and the content of its liability-inducing action: contract terms *about* its actions (here, the design or warnings). Without any such contractual

term, there is no federal interest, because there is no fear that imposing "liability …

w[ould] directly affect the *terms* of Government *contracts*." *Boyle*, 587 U.S. at 504-

07 (emphasis added).

> 2. *No prior case has found a uniquely federal interest without relevant*
> *contractual language.*

Neither case 3M cites, Op.Br. at 32-33, supports its argument for a contract-

less federal-interest-in-the-ether.

In *Brinson v. Raytheon Co.*, 571 F.3d 1348 (11th Cir. 2009), Air Force

"engineers signed off on … drawings of T-6A components, including the [allegedly

defective] rudder trim system," confirmed it met "the *Contractual requirements*,"

and reviewed and approved the "'as-built' configuration" and "design drawings to

ensure that the aircraft complied with those requirements." *Id.* at 1354-55 (emphasis

added). *In re Agent Orange Prod. Liab. Litig.* is much the same. 517 F.3d 76 (2d

Cir. 2008). "The government purchased the defoliants … pursuant to various

government contracts," and the "contracts required" a precise formulation of Agent

Orange, but plaintiffs argued state law required a different manufacturing method.

*Id.* at 83. After the contract (but before the injury), "the Army examined the

toxicology data" and determined it "posed 'no health hazard.'" *Id.* at 95. Knowing

the same facts alleged by plaintiffs, "the government continued to order Agent

Orange having evaluated its toxicity levels and declared them acceptable." *Id.*

Both cases emphasized the obligations imposed by specific design specifications in a procurement contract, which are entirely lacking here. When parties already have a contractual relationship covering a given subject (the design), formal remediation after a breach can, through the course of dealing and ratification, become incorporated as a modified contract term (modified design requirements). Here, the "purchase order[s]" 3M gestures toward, Op.Br. at 32, never covered the design or warnings. With no relevant contractual terms to begin with, no course of dealing modified any term (much less with the formality *Brinson* required), and so designs and warnings remain outside any uniquely federal interest.

More practically, in *Brinson* and *In re Agent Orange* the Army learned of all the defects, investigated, and formally mandated specific remediation, *then ordered more of the product* under that remediation scheme, and soldiers were injured by those post-remediation products. Here, the government discovered the defect *after* the Veterans' injuries and remediated by *suing* 3M for fraud.

Finally, there is no uniquely federal interest because the CAEv2 was a commercial product. *See In re Hawaii Fed. Asbestos Cases*, 960 F.2d 806, 811 (9th Cir. 1992). Because the district court did not "address the merits of Plaintiffs' commercial availability argument," Dkt.1280 at 27 n.23, and "the parties' arguments on appeal did not focus on it," the Court should remand if it does not affirm. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1228 (11th Cir. 2008).

**C. There Is No Significant Conflict Between Any Purported Federal Interest and State Design-Defect Law.**

Finding a uniquely federal interest "merely establish[es] a necessary, not a sufficient, condition." *Boyle*, 487 U.S. at 507. State law still applies unless it "significant[ly] conflict[s]" with federal common law. *Id.* The Court fashioned a three-part rule for conflict:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512. To satisfy prong one, specifications must be *both* "reasonably precise" and "approved." The district court correctly held that 3M fails at step one.

### 1. *No reasonably precise government-approved CAEv2 specifications exist.*

The district court correctly held that 3M fails the requirement of "reasonably precise specifications." The Supreme Court and this Court have recognized that the government contractor defense applies only if the precise design specifications require the design defects at issue. Where the "duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary," there is no conflict. *Boyle*, 487 U.S. at 509. For example, a contract for "an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction," would not "be contrary" to a design-defect claim over a missing "safety feature." *Id.*

This Court's analysis of the insufficient specifications for the S-3 Navy plane is instructive. *Gray v. Lockheed Aeronautical System Co.*, 125 F.3d 1371 (11th Cir. 1997) *vacated on other grounds*, 524 U.S. 924 (1998) *remanded* 155 F.3d 1343 (11th Cir. 1998) ("affirm[ing] the remainder of our decision").  The S-3 had a defective servo (a part that links the pilot to the ailerons, which are movable wing flaps):

> Navy engineers and Lockheed employees worked closely together on many aspects of the S-3's development, and the Navy held a series of preliminary design reviews and critical design reviews. Upon completion of its manufacture, the S-3 passed all of the Navy's acceptance tests, and Lockheed delivered the S-3 to the Navy.

*Id.* at 1374.  Lockheed wrote 54 pages of servo specifications and "incorporated it into its bid to the Navy for the S-3's contract."  *Id.* at 1378.  Those specifications gave "the general requirements for the aileron servo, *i.e.*, automatic reversion if both hydraulic systems fail, and servos with manual reversion on ailerons," but were insufficient because "[t]he ultimate design of the product is determined *not only* by the original procurement and contract specifications, *but also* by specific, quantitative engineering analysis developed during the actual production process." *Id.* (quoting *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 702 (4th Cir. 1989)) (emphasis added).  And so, "although the narrative may embody some aspects of the servo's specifications, it does not comprise the *precise design specifications* that the *Boyle* test requires."  *Id.* at 1378 (emphasis added).

*a. The only written specifications do not conflict with state law.*

Here, even more clearly than in *Gray*, there are no specifications requiring any (let alone all) of the defects grounding the design-defect claims. The only written government CAEv2 specifications were the 2006 MPID. On appeal, 3M does not even mention the MPID, forfeiting any argument that it provides the necessary specifications.

Such an argument would be meritless. The MPID listed the CAEv2 by model number ("P/N 370-1000, or equal," PX37 at 41). Where a contract specifies products "by model number," no conflict exists because "it is impossible to say that the Government" considered each design element. *Boyle*, 487 U.S. at 509. The MPID also listed "salient characteristics," including that the earplugs be "triple-flange style," "provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech," meet "sound attenuation" minima based on a chart with frequencies and decibel levels, and "be tested in accordance with ANSI §3.19." PX37 at 41-42. The MPID says nothing that would cast aside state law on the design defects presented to the jury: stem length, width, flexibility, or the location of the flanges. *See* PX37. State law and the MPID are not "identical," but neither are they "contrary," meaning there is no conflict.

31

> b. *The unwritten materials 3M identifies are not reasonably precise specifications and do not address the defects at issue.*

3M ignores the only written specifications, instead pointing to insufficient emails and innuendo.

*First*, Ohlin's two April 1999 emails are not specifications of any sort. The first, from April 9, responded to Brian Myers from Aearo: "In addition to the plug being too long for the case and an incresed [sic] potential for wind noise, my green suit friends tell me it sticks out too far for the kevlar combat helmet. The last one is a show stopper." DX4 at 2. The second says the same thing on April 12 to an Army colleague. DX5 at 2. Unsurprisingly, Ohlin stated these were *not* specifications. PX53 ("There is no DOD specification for the combat arms earplug."); PX9(Ohlin-168:17-23) (same). And they certainly fall far short of Lockheed's 54-page procurement specifications in *Gray*, which still could not clear *Boyle*'s hurdle of "precise design specifications."

Even if these did constitute specifications, there was nothing reasonably precise about saying that the earplugs could be shorter, without specifying how much or how to redesign them to adjust the length. In fact, "the record reflects there were multiple ways to modify the length of the earplug." Dkt.1280 at 43. Rather than cutting the *stem* (the defect at issue here), 3M could have made the flanges or tips smaller, DX56 at 61:8-17 (Berger, flanges); DX57 at 82:20-83:13 (Knauer, flanges or tip); PX93 at 1 (Dancer, tip). Aearo chose how short to make the CAEv2. 3M

will not say how much shorter the military required the CAEv2 to be. Op.Br. at 6 ("approximately one-quarter inch"); Op.Br. at 35 ("too long"). That is because the military never gave a precise number. Aearo told Ohlin it could "shorten the plug by the 1/4" required to fit your current container," DX4, but actually shortened it by .184". DX14 at 10-11. The length—like every other feature—was Aearo's design choice. In any event, any reference to the length of the earplugs does not address (let alone give reasonably precise specifications for) the many defects unrelated to length: stem width, stiffness, and flange positioning.

*Second*, according to 3M, the "military gave [3M] significant guidance on the design," Op.Br. at 34, citing DX1 for the proposition that the "military knew" it wanted linear and non-linear earplugs, and DX2 saying that it "discussed these options," and "Ohlin expressed that he was interested in the two-ended option." Op.Br. at 34. These discussions *could not have been* "guidance on the design," because the same document says ISL "already ha[s a] patent on new nonlinear value and have applied for [a] patent on 2-ended plug" and that Aearo "propose[d] 3 solutions," namely "openable/closable," "2-ended plug," and "two separate plugs." DX2 at 3-4. Far from sending Aearo new design directions, Ohlin picked one of the three options Aearo presented. And neither document provides *precise* specifications mandating the specific defects at issue.

33

*Third*, 3M claims CAEv2 samples were *themselves* specifications, since "*Boyle* does not require that the manufacturer provide drawings, plans, or written descriptions." Op.Br. at 35. The same happened in *Gray*. There, Lockheed's "S-3 passed all of the Navy's acceptance tests," so it argued that "requiring Lockheed to produce evidence that the Navy reviewed and approved specific engineering drawings of the servo" was unnecessary. *Gray*, 125 F.3d at 1374-75. This Court disagreed, finding no "precise design specifications that the *Boyle* test requires." *Id.* at 1378. This Court has never sustained the government contractor defense without *both* drawings and written descriptions—much less neither one. If physical samples were enough, the government contractor defense would apply to *every* product the military uses after the first delivery. 3M objects that "numerous courts" have not required "plans, drawings and descriptions," some of which were "cited favorably in *Brinson*." Op.Br. at 35. But *Brinson* expressly recognized that *Gray* rejected 3M's argument, summarizing as follows:

> *Rather than producing copies of engineering drawings*, Lockheed submitted a document containing a narrative description of the general requirements the servo was designed to meet. [citing *Gray*]. This Court held that *general narrative requirements* cannot rise to the level of "reasonably precise specifications."

*Brinson*, 571 F.3d at 1352 (emphasis added) (citations omitted).

3M's out-of-circuit authorities all had formal, detailed specifications that the government reviewed and approved. *Ramey v. Martin-Baker Aircraft Co.* involved

"specification 18471, prepared by [an] ejection seat specialist from the Navy" which became "procurement specification 74-800200" that "[t]he Navy reviewed and changed."  874 F.2d 946, 948 & n.4 (4th Cir. 1989).  The other two cases, like *Brinson*, addressed post-design formal remediation by the military.  *See Dowd v. Textron, Inc.*, 792 F.2d 409, 411 (4th Cir. 1986) (manufacturer proposed several safety modifications after the defect came to light, and the Army allowed some, but not others); *Lewis v. Babcock Indus.*, 985 F.2d 83, 89 (2d Cir. 1993) ("Government reordered the specific Babcock cable, with knowledge of its alleged design defect" after investigation, and the reordered cable harmed plaintiff).  Here, the military discovered the defect *after* it harmed the Veterans, and, rather than reordering more CAEv2s, sued 3M.  The district court correctly found "no such evidence in this litigation" of post-production approval.  Dkt.1280 at 35 n.29.

> ## 2. There is no evidence that the military substantively reviewed—let alone approved—CAEv2 specifications.

3M also fails *Boyle*'s first prong because the military did not review and approve specifications of the design elements grounding the claims.  As *Boyle* explained, conflict occurs only "within the area where the policy of the [FTCA's] 'discretionary function' would be frustrated," namely where government discretion "involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness."  487 U.S. at 511-12.

35

Following *Boyle*, this Court required Lockheed to "show that the Navy 'actually participated in discretionary design decisions, either by designing [the servo] itself or approving specifications' that the contractor prepared." *Gray*, 125 F.3d, at 1377 (quoting *Harduvel*, 878 F.2d at 1316) (alterations in original).  That was because:

> "[D]iscretion over significant details and all critical design choices [must] be exercised by the government." … Where the government merely approves imprecise or general guidelines, the contractor retains the discretion over the important design decision and enjoys no immunity against liability based on the *Boyle* defense.  A finding that the military approved the specifications requires more than a tacit approval: the approval must be meaningful, not a mere formality.

*Id.* (quoting *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1481 (5th Cir. 1989)).

The military's review of CAEv2 specifications, if any, was not meaningful. 3M cites DX11, noting that Ohlin "spent more than a year with" CAEv2 samples, presumably suggesting that he carefully evaluated them (even 3M agrees no one *else* reviewed them).  Op.Br. at 34.  But the undisputed record is that 3M sent Ohlin CAEv2 samples in March 1998, and *nothing happened* until April 1999, when *Aearo* again communicated with Ohlin, volunteering that "we can probably shorten the plug … to fit your current container."  DX3 at 1.  There is no evidence that Ohlin did any substantive review of the samples over that year.

The CAEv2 *had* drawings and specifications, *e.g.*, PX2, PX3, DX11, DX14, but 3M "conceded" the military never saw them.  Dkt.1280 at 38 n.34.  With no

36

drawings, specifications, testing, or Flange Report, Ohlin could make no "judgment … [about] the trade-off between greater safety and greater combat effectiveness," *Boyle*, 487 U.S. at 511, because he had no idea that any such tradeoff existed.  *See* PX77 at 1 ("Should I share this with Ohlin?").  The CAEv2 is both unsafe and harmful to combat effectiveness, and presents not a tradeoff, but "problems."  PX32.  Ohlin's review was, at most, "a mere formality," and his approval of specifications 3M failed to provide was not even "tacit."  *Gray*, 125 F.3d, at 1377.

### D.  There Is No Significant Conflict Between Any Purported Federal Interest and State Failure-to-Warn Law.

On failure-to-warn, the district court correctly rejected the government contractor defense because no specification *prohibited* 3M from issuing a warning.  The leading case is *Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487 (11th Cir. 1990), in which this Court rejected the government contractor defense because the written "Navy Department specifications d[id] not contain any prohibition against health warnings on the product."  *Id.* at 1489.  3M dismisses *Dorse* as a "one-sentence per curiam decision," Op.Br. at 42, but it is binding precedent that adopted and republished the district court's sound ruling, which rested on the lack of any express prohibition on a warning.  This Court recognized *Dorse* as binding precedent in *Glassco v. Miller Equip. Co.*, 966 F.2d 641, 644 (11th Cir. 1992), which reversed, "[a]s inconsistent with *Dorse*," the district court's "holding that the government contractor defense shielded Miller from this duty to warn claim."  *Id.* at 644 & n.4.

Moreover, *Dorse* is just an application of the general principle that the government contractor defense grants immunity only where the government "direct[s] a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001); *see also Boyle*, 487 U.S. at 509 (if "[t]he contractor could comply with both its contractual obligations and the state-prescribed duty of care," then "[n]o one suggests that state law would generally be pre-empted in this context"). Unless the government directed the contractor not to warn, there is no conflict.

3M's argument on this point is, in full, that an employee remembers Ohlin— who died before this suit—orally saying "not to include instructions" inside the bulk box for CAEv2s. DX62 at 326. This hearsay description of a one-off phone call is dubious, to say the least, and 3M's 30(b)(6) witness conceded "I don't ever recall them telling us that we couldn't include something." PX51 at 287-88. No case has held that such an amorphous source could constitute a *specification* for a product.

But even assuming *arguendo* that this phone call occurred exactly as described, it falls far short of a government requirement not to issue a warning. First, Ohlin was not a contracting officer, and did not have authority to contradict the MPID. Second, the call concerned "instructions"—*i.e.*, how to use the device—not a warning of the risks. The Veterans brought only warnings-based claims (not instructions, unlike other bellwethers), and 3M has not argued that Ohlin decided no

38

*warnings* should be included; he undisputedly did not know warnings were needed. Third, it concerned only a supposed prohibition on a particular location for instructions (inside the bulk box)—not a prohibition on all instructions anywhere.[9] Fourth, following these supposed instructions without documentation or follow-up was clearly negligent—after all, Ohlin told 3M "My concern for any earplug issue is that they are going to be handed out without proper instructions." DX38. It would be absurd to turn a supposed oral statement not to put instructions in one particular location into a government-imposed obligation prohibiting 3M from warning military service members of the dangers of its product.

### E. 3M Also Failed the Second and Third Prongs, but This Court Should Not Reach Them.

After ruling against 3M on "the first element of the *Boyle* three-part test," the district court did "not address the remaining two elements," Dkt.1280 at 34 n.28, both of which the Veterans briefed. The court found that an "even deeper dive into even murkier factual waters would be required to resolve *Boyle*'s second and third elements." Dkt.1329 at 11 n.5. If this Court vacates the district court's order, it should remand.

---

[9] 3M ridicules the "possibility of providing useless instructions on the outside of a bulk shipment box," Op.Br. at 44, but its derision is unwarranted. EPA regulations and the MPID both require warnings to be placed on the outside of bulk boxes. PX37 at 41-43; 40 C.F.R. §211.204-3 & -4. 3M supplies no reason to think doing so is useless.

## II.    3M'S NCA ARGUMENT PROVIDES NO BASIS TO VACATE THE JUDGMENT.

After notice-and-comment rulemaking, EPA—wielding congressionally delegated authority under the NCA—promulgated labeling regulations for "hearing protective devices" in September, 1979.  They "apply to *all hearing protective devices* manufactured after [1980]."  40 C.F.R. §211.201 (emphasis added).  "[H]earing protective devices" are "[a]ny device or material, capable of being worn on the head or in the ear canal, that is sold wholly or in part on the basis of its ability to reduce the level of sound entering the ear."  40 C.F.R. §211.203(m).  The regulation unambiguously covers the CAEv2.  Under applicable state law, federal regulations (not just statutes) may supply a relevant standard of care.  The district court properly included three specific EPA regulations as a relevant standard of care for one count for each Veteran.  *See* 4/29/21 Tr. 61:12-62:11 (Estes and Keefer negligence *per se* instruction); 4/29/21 Tr. 84:6-10 (Hacker negligent failure-to-warn instruction).  3M has long recognized that EPA regulations apply to the CAEv2,[10] and does not argue otherwise here.  Instead, it relies on the statutory "combat use" exception, while ignoring the on-point regulations, which establish that the exception does not apply here.

---

[10] Berger concluded "the NRR must be on all products, including those sold to the military" after he "researched this topic extensively."  PX35 at 2.  He noted that Federal Register responses to comments specifically flagged "hearing protectors sold to the military," never suggesting the military was "exempt."  *Id.* at 7.

3M's argument fails for three reasons. First, the NCA funnels all challenges to EPA regulations through the D.C. Circuit. Second, 3M's interpretation is erroneous both under the plain text of the statutory provision and, at minimum, does not overcome *Chevron* deference. Third, any error was harmless here because the issue applies only to *one* claim for each Veteran, leaving many bases for the verdict untouched.

### A. This Court Lacks Jurisdiction to Set Aside EPA's Regulations.

Because the jury instructions refer to EPA regulations (not the statute), and those regulations apply by their terms, 3M's statutory argument is irrelevant unless this Court sets aside the regulations as contrary to the statute. *See* 5 U.S.C. §706(2). But "[a]ction of [the EPA] Administrator with respect to which review *could have been obtained under this subsection shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. §4915(a) (emphasis added). That is this case. The Veterans are plaintiffs in a civil proceeding that seeks to enforce the regulation. Their negligence *per se* claims seek to enforce 40 C.F.R. §§211.206-1(a), 211.211, 211.204-1(b)(1) and 204-4(e). The statute expressly allows private parties under "common law to seek enforcement of any noise control requirement." 42 U.S.C. §4911(e).

Review of the regulation 3M claims is *ultra vires* "could have been obtained" in a petition for review. 42 U.S.C. §4915(a) ("A petition for review of…any labeling

regulation under section 4907 may be filed only in the [D.C. Circuit].”); *cf. Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014) (“Whichever way it is done, to ask the district court to decide whether the regulations are valid violates the statutory requirements.”).   Accordingly, this Court lacks jurisdiction to hear 3M’s argument to invalidate the regulation.

Because the Court cannot set aside the regulation, 3M’s statutory argument is moot since the regulation alone supports the instructions.

## B. The Combat Use Exception Does Not Apply.

Because 3M ignores the on-point regulations, its brief elides the proper question here: whether EPA’s decision to regulate *all* hearing protective devices passes muster under *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[11]   Under that familiar two-step regime, step one asks “whether Congress has directly spoken to the precise question at issue.” *Id.* at 842. But “if the statute is silent or ambiguous with respect to the specific issue,” step two asks “whether the agency’s answer is based on a permissible construction of the statute.” *Id.* at 843.   Here, the “precise question at issue” is whether the CAEv2 are

---

[11] The district court focused on the plain text, but the Veterans briefed agency deference. *See Estes*.Dkt.41 at 31 (quoting *Conley v. Nw. Fla. State*, 145 F. Supp. 3d 1073, 1079 (N.D. Fla. 2015) (applying *Chevron*)).   Further, *Chevron* is “a doctrine about statutory meaning” and a party cannot forfeit the “meaning of a statute.” *Guedes v. A.T.F.*, 920 F.3d 1, 22 (D.C. Cir. 2019).

"military weapons or equipment which are designed for combat use," 42 U.S.C. §4902(3)(B), which are exempt from the NCA.  Under either step, the answer is no.

      *1.  Under the plain text, "equipment" does not cover earplugs.*

As the district court correctly held, the statutory term "equipment" consistently refers to noise-emitting articles, and bears that meaning in the combat-use exception.  The statute defines "product" as "any manufactured article or goods or component thereof" excepting:

> (A) any aircraft, aircraft engine, propeller, or appliance…; or
> (B)(i) any military **weapons** or **equipment** which are designed for combat use; (ii) any **rockets** or **equipment** which are designed for [NASA]; or (iii) … any other **machinery** or **equipment** designed for use in experimental work done by or for the Federal Government.

42 U.S.C. §4902(3)(B) (emphasis added).  Under the *noscitur a sociis* canon, "a word is known by the company it keeps."  *McDonnell v. United States*, 579 U.S. 550, 569 (2016).  Courts rely on this canon when a general term might otherwise give "unintended breadth to the Acts of Congress."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (citation omitted).  Here, "equipment" is in the company of "weapons," "rockets," "machinery," and "aircraft engine[s]," all of which make noise.  The only Court of Appeals to construe these terms (addressing section 4903) understood the term "equipment" to apply to noise-making products.  *See Abreu v. United States*, 468 F.3d 20, 33 (1st Cir. 2006) ("The federal requirements applicable

to *noise emissions by products*, however, expressly exclude 'any military weapons or equipment which are designed for combat use.'" (emphasis added)).

3M identifies nothing in the combat-use exception indicating congressional intent to apply it to noise-reducing products. 3M describes the NCA as a "two-sided prohibition (noise-producing or reducing)," Op.Br. at 47, because it allows EPA to require labels on noise-emitting and noise-reducing products under section 4907. That is true but irrelevant, as it sheds no light on the best interpretation of the statutory term "equipment." Zooming out, the statute requires EPA to identify and report on noise sources (§4904), promulgate binding "noise emission standards" (§4905), and require labeling and recordkeeping by manufacturers (§§4907, 4912). It tells all federal agencies to follow local noise ordinances (§4903) and procure low-noise-emission products (§4914). All of these provisions focus on noise emission.

The *only* provision that addresses noise-*reducing* products is section 4907, but contrary to 3M's argument, section 4907 does not use the term "equipment," and so that section's two-sidedness sheds no light on the term's meaning. Under section 4907, the EPA "Administrator shall by regulation designate any product (or class thereof) … sold wholly or in part on the basis of its effectiveness in reducing noise," 42 U.S.C. §4907(a), and the "regulations shall specify" "its effectiveness in reducing noise" including "the methods and units of measurement to be used," *id.* §4907(b). All references to equipment are products that *make* noise. Simply put, some of the

44

"products" subject to section 4907—but no other section—are noise-reducing, but that does not suggest the *exempted* equipment in the definition provision are noise-reducing.

The statute's other uses of "equipment" all confirm it concerns only items that produce noise. The very first section of the NCA includes a congressional finding "that the major sources of noise include transportation vehicles and equipment, machinery, appliances, and other products in commerce." 42 U.S.C. §4901(a)(2). The statute's central provision, section 4905 provides the remedy, requiring EPA to promulgate "noise emission standard[s] … requisite to protect the public health and welfare" considering "the degree of noise reduction achievable through the application of the best available technology." 42 U.S.C. §4905(c). Echoing its finding, Congress required EPA to propose regulations applying to any "major source of noise … in one of the following categories:"

> (i) Construction equipment.
> (ii) Transportation equipment (including recreational vehicles and related equipment).
> (iii) Any motor or engine (including any equipment of which an engine or motor is an integral part).
> (iv) Electrical or electronic equipment.

42 U.S.C. §4905(a)(1) (emphasis added).

In sum, section 4905 uses the term "equipment" five times, and all agree that provision refers *only* to noisy equipment. "[I]dentical words and phrases within the same statute should normally be given the same meaning." *FCC v. AT & T Inc.*, 562

45

U.S. 397, 408 (2011) (citation omitted).  Thus, when Congress chose in the definition provision to exempt "equipment" (which otherwise would have fallen under section 4905), it meant the noise-producing "equipment" at issue in section 4905.  Congress had two provisions, one which "plainly covered" noise-emitting and noise-reducing items (section 4907), "and another … relating to" noise-emitting equipment only (section 4905), and its "language … tracks the latter." *AT & T Inc.*, 562 U.S. at 409.

The NCA's text and structure establish that the CAEv2 falls outside the combat-use exception.

### 2.  EPA's interpretation was reasonable.

Under *Chevron*, EPA's determination that hearing protective devices do not fall within the combat-use exception "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).  At minimum, the term "equipment" in the combat-use exception is silent or ambiguous and *could* mean the same thing "equipment" means in the rest of the statute.  EPA recognized that logic, exempting equipment designed for combat use from its low-noise-emissions-products regulation, 40 C.F.R. §203.1(a)(4)(ii)(a), but not from its noise-reduction labeling regulations, 40 C.F.R. §211.  There is no basis for treating this longstanding, carefully considered

regulation—to which the military has never objected—as an unreasonable interpretation of the NCA.

## C. The Court Need Not Review This Issue Because Other Counts Support the Verdict.

This Court can avoid each of the issues above by holding that any putative error is harmless since it had no relevance to the bulk of the jury's findings of liability, and therefore to the judgment. "Jury instructions are subject to harmless error review." *MidlevelU, Inc.*, 989 F.3d at 1215 (internal quotation marks omitted).

Here, the lack of substantial prejudice is obvious because EPA regulation instructions applied only to one count for each Veteran. The district court told the jury to consider EPA regulations *only* for negligence *per se* for Estes and Keefer, and failure-to-warn for Hacker. *See* 4/29/21 Tr. 61:12-62:11; 4/29/21 Tr. 84:6-10. But the jury awarded the *same* damages on other counts as it did for the sole one where the regulations were relevant.

Under well-established law, an erroneous instruction on one basis for liability does not permit vacating a judgment that other bases independently support. *See Goldsmith*, 513 F.3d at 1279; *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008) (erroneous instruction is "harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory"). Any supposed error "is harmless [because] there is no demonstrable effect on the ultimate

47

verdict," which is the independently supported judgment requiring a payment of damages. *Alabaster*, 1 F.4th at 1312.

3M ignores that EPA regulations affect just one claim, and that the judgment is supported by *every* other claim. 3M's only rejoinder is a single sentence with the unsupported assertion that the supposed error "undoubtedly tainted the jury's deliberations on every claim." Op.Br. at 50. The law disagrees with 3M's surety. Courts presume juries follow instructions. *See United States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021) (supposed error in one instruction was irrelevant because jury is presumed to follow instruction on other theory that supported the conviction). Here, the instructions required finding specific elements on specific claims. For instance, the claims for breach of warranty and fraudulent misrepresentation depended on what 3M said and did not say. EPA regulations had nothing to do with those claims. That is why the district court rejected 3M's motion for a new trial partly because 3M failed to show any error "caused substantial prejudice." *Estes*.Dkt.205 at 3; *Hacker*.Dkt.223; *Keefer*.Dkt.207. 3M ignores this ruling and the evidence on the other claims.

To the extent 3M argues the EPA regulations are relevant *beyond* the jury instructions (that any mention of the regulations at trial was erroneous), it failed to preserve that argument. *Compare* Op.Br. at 49 (opening statement) *with* 3/30/21 Tr. 45-46, 66 (no objection); Op.Br. at 50 (cross-examination) *with* 4/27/21 at 208 (only

objection was "argumentative"). *See MidlevelU, Inc.*, 989 F.3d at 1219 (Where a defendant "fails to explain a specific objection to any evidentiary ruling, [] it has abandoned that issue."). The regulations were not even remotely the focus of the five-week trial. 3M identifies only scattered references in a trial record of thousands of pages. The Veterans argued for liability based on the defects of the CAEv2; that was the focus of the trial; and those defects were what the jury soberly and carefully rested the verdict upon.

## III.  NONE OF 3M'S EVIDENTIARY NITPICKS WARRANT A NEW TRIAL.

When reviewing evidence objections, this Court asks "only whether the trial court abused its discretion in making its gatekeeping [evidentiary] determination." *United States v. Barton*, 909 F.3d 1323, 1335 (11th Cir. 2018). A purported error is harmless when it "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *United States v. Dickerson*, 248 F.3d 1036, 1048 (11th Cir. 2001).

Of the hundreds of evidentiary issues that arose before and during trial, 3M appeals three, none of which were erroneous. And aside from hand waving at a "profoundly distorted trial," 3M has not shown that these rulings, individually or collectively, warrant tossing a five-week jury trial inundated with unchallenged and un-appealed evidence supporting the verdict.

### A. Admitting the Air Force Memo and CID Report Was Proper.

3M first takes issue with two exhibits showing the military's knowledge of the CAEv2's performance and efficacy: 1) the Air Force Memorandum reflecting instructions to remove the CAEv2 from inventory upon learning that 3M concealed testing information, P-GEN-2586; and 2) the Criminal Investigative Command report concluding the CAEv2 stem was too short, the government did not know about 3M's testing, and that it may not have purchased the earplugs if it had known, P-GEN-0009. Both exhibits were highly probative of the Veterans' failure-to-warn claims and 3M's defenses; neither was hearsay.

#### 1. Air Force Memo.

3M objected to the Air Force memo pre-trial and during trial under Rule 403, but never raised Rules 802 or 805. Regretting that strategy, 3M now objects that the Air Force Memo was hearsay. Because 3M "makes no effort to satisfy the [plain error] standard" on appeal, this Court should "decline[] to conduct a plain error analysis *sua sponte*." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1298 (11th Cir. 2021).

Notwithstanding 3M's strategy, the district court admitted the memo pre-trial "only for the jury's consideration of [the] military's knowledge of problems with the CAEv2," a limited—but important—non-hearsay purpose. *Estes*.Dkt.115, Exhibits Order 2, at 9; *see also* 4/1/21 Tr. 3:17-23; 3/31/21 Tr. 161:5-189:10; *Estes*.Dkt.205;

*Hacker*.Dkt.223; *Keefer*.Dkt.207.  At trial, the court admitted the memo after 3M's opening statement "referenced numerous times what the military knew," 3/30/21 Tr. 153:19-24, and 3M elicited testimony about "all of the studies and the tests that the military—different branches have done, including the Air Force," leaving the jury "with the impression that the military liked the plug, and the plug's performance." 4/1/21 Tr. 3:7-23.  Indeed, because 3M emphasized the military's supposed knowledge in its trial presentation, denying the Veterans' the opportunity to rebut that contention may have been error.

This approach demonstrated restraint, as the Memorandum was also admissible as a public record for its truth.  *See* Fed. R. Evid. 803(8)(A)(i); *cf. Hacker*.Dkt.141 at 2-4 (admitting Ohlin Emails under Rule 803(8)); *Blum*.Dkt.99 at 5 ("This court has admitted, many times at Defendants' request, numerous exhibits as public records, including emails with government email addresses, PowerPoint presentations, and research studies.  The instant memorandum, on Department of the Air Force Headquarters letterhead, pertaining to a matter affecting the Air Force, could hardly be characterized as less official than those other exhibits.").

### 2.  CID Report.

The CID report was also highly probative of the military's knowledge, as it was specifically commissioned to "determine whether or not the United States government and the Army knew about Defendants' test results from 2000 and

whether that was material to their decision to purchase the CAEv2." Dkt.1693 at 7 (citing Coleman Dep. Tr. 26:7-29:9, 53:22-54:10); *Estes*.Dkt.205 at 3-5 (post-trial order); *Hacker*.Dkt.223; *Keefer*.Dkt.207. Factual findings and related conclusions contained within an authorized investigative report like the CID report are admissible for their truth when they satisfy Rule 803(8)'s trustworthiness requirement. *See Beech Aircraft v. Rainey*, 488 U.S. 153, 170 (1988).

3M has never disputed the trustworthiness of the CID report. Instead, 3M argued below and here a blatant mischaracterization of the report—that it "simply repeated the interviewees' statements." Op.Br. at 52. But as the district court recognized, the investigation was conducted to "provide the United States Attorney's Office 'fact-based, unbiased investigative findings that reflect impartiality.'" Dkt.1693 at 7 (citing Coleman Dep. Tr. 26:7-29:9, 53:22-54:10). To that end, Special Agent Coleman analyzed and weighed numerous written materials and sworn depositions from Defendants' witnesses alongside her interviews of government personnel, which "*confirmed* that had they known about the February 2000 test results … on the CAE they may not have purchased the items." *Id*. (emphasis in original); *see also* P-GEN-0009 at 2-4. Ultimately, "the final report was approved by SA Coleman's supervising agent and was circulated outside of the CID," which "is exactly the sort of 'factual findings from a legally authorized

52

investigation' that 803(8)[A](iii) is designed to exclude from the prohibition on hearsay." Dkt.1693 at 6-8).

3M's complaints about "the district court's decision to admit the summary but exclude the underlying notes" are similarly revisionist.  Op.Br. at 52.  At 3M's behest, the court "erred on the side of caution" and excluded the witness notes, even though they could have been admitted as "nonhearsay [] evidence of the government's state of mind."  3/31/21 Tr. 290:13-291:17.  Nonetheless, 3M misrepresented the witness interviews during opening arguments, sparking the following: "3M, you can't have it both ways.  You can't factually keep the witnesses' statements out totally, and then suggest to the jury things that are, frankly, misleading about those witnesses."  *Id*. at 292:21-24.  Ultimately, the court let 3M decide whether to continue presenting evidence about the CID witnesses and allow their interview notes into evidence.  3M, knowing that the notes would show that the witnesses would not have purchased the CAEv2s had they known about the test results, opted to keep the notes out.  *Id*. at 294:1-295:8, 300:25-301:2.

3M can show no prejudice from the Air Force memo or CID report because the jury heard other evidence conveying the same information, which 3M has not appealed.  *See, e.g.*, P-GEN-2602.  Moreover, the district court cured any potential prejudice with contemporaneous and repeated instructions not to consider the statement ("were found to be defective") for its truth.  *See* 4/1/21 Tr. 126:2-8,

130:15-131:8; 4/12/21 Tr. 303:22-304:4; *see also* 4/2/21 Tr. 230:24-231:21 (CID report, same).  Courts presume juries follow instructions.  *See United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011).

**B. The District Court Properly Admitted Evidence of ARC-Testing Issues.**

Despite making no contemporaneous Rule 404 objection, 3M next contends that evidence of quality-control issues with 3M's ARC box was prior-bad-act evidence.  The only plain error here is 3M's mischaracterization of the ruling, which did not admit the ARC testing as propensity evidence.  Dkt.1695 at 19; *Keefer*.Dkt.177 at 3-4; *Hacker*.Dkt.194 at 3-4; *Estes*.Dkt.175 at 3-4.  For example, as a part of the MPID's "100 percent … acoustical impedance test" requirement, 3M's ARC-box testing was relevant to the Veterans' negligence claims, including Mr. Hacker's negligence claim under Kentucky law.  *Hacker*.Dkt.194 at 4 ("A failure to conduct adequate safety tests tends to show that a manufacturer did not exercise reasonable care in its production of the product.") (quoting *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 713 (W.D. Ky. 2013)).  The issues revealed by the ARC testing and subsequent waivers also demonstrate 3M's failure to warn and circumstantial evidence of its motive, knowledge, and intent for the fraud claims.

Additionally, the district court correctly found the ARC-testing evidence directly relevant to the Veterans' requests for punitive damages.  *Keefer*.Dkt.177 at 4; *Hacker*.Dkt.194 at 4; *Estes*.Dkt.175 at 4; *cf*. O.C.G.A. §51-12-5.l (b); *Horton v.*

*Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985). The ARC-testing revealed chronic problems with the CAEv2s that 3M failed to correct for many years, opting instead to issue waivers of its own rules. *See, e.g.*, P-GEN-78; P-GEN-2449; 4/16/21 Tr. 166:1-6; 4/8/21 Tr. 213:7-19. Moreover, 3M itself put the "overall quality assurance process for the CAEv2," Dkt.1695 at 18-19, at issue by introducing evidence of its "world class lab" and putting on a "world class leading expert fitter," 4/26/21 Tr. 358:24-359:9, which the Veterans were entitled to rebut with the ARC-testing issues. *See Bearint ex rel. Bearint v. Dorrell Juv. Grp., Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004) ("This Circuit recognizes the concept of 'curative admissibility'—also called 'opening the door' or 'fighting fire with fire.'" (citation omitted)).

Aside from a vague reference to "hours of testimony and a slew of documents," Op.Br. at 53, 3M fails to argue prejudice. Mere duration does not equate to prejudice. 3M's conclusory argument does not say how the evidence affected the trial's outcome. *See Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1276 (11th Cir. 2020).

## C. The Court Issued a Proper Curative Instruction Regarding Other Soldiers' Use of CAEv2s.

Most confoundingly, 3M attacks a *curative* instruction it prompted by *violating* pre-trial orders. 3M successfully moved to exclude evidence of the number of other claimants as relevant but unduly prejudicial. *See* Dkt.1695 at 5-7. But the

55

court explicitly limited that ruling: if 3M "present[ed] evidence or argument that Plaintiffs' experiences with the CAEv2 are aberrational, isolated incidents, then Plaintiffs w[ould] be entitled to rebut the argument with evidence that hundreds of thousands of individuals have made similar allegations involving similar experiences with the CAEv2." Dkt.1716 at 12.  3M did precisely that.

Ignoring repeated warnings, 3M "put in front of th[e] jury that thousands of soldiers have had no problem with this plug." 4/22/21 Tr. 300:15-301:3; *see also id.* at 172:23-173:2, 192:13-16; 194:13-17.  Fairness permitted the Veterans "to counter … that thousands of soldiers have had a problem with the plug," 4/22/21 Tr. 300:16-301:3.  The Veterans cross-examined a 3M witness about the "large number" of soldiers claiming hearing loss.  4/28/21 Tr. 107:19-108:3.  Immediately, the court explained:

> You can consider that there are soldiers who wore the CAEv2 without complaint about fit, and … [those] who have complaints about the fit with the plug. But ultimately your responsibility as jurors … is not to decide whether the CAEv2 did or did not fit other people. Your responsibility is to decide whether the CAEv2 fit Mr. Estes, Mr. Keefer, and Mr. Hacker.

*Id*. at 111:1-8.  No straight-faced argument transforms this instruction—necessitated by 3M's actions—into an abuse of discretion or "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1115 (11th Cir. 2006).

56

## CONCLUSION

This Court should affirm the judgment.

Dated: June 27, 2022                    Respectfully submitted,

                                        /s/ Ashley Keller

Noah Heinz            O. Carter Snead         Ashley Keller
KELLER POSTMAN LLC   Professor of Law        KELLER POSTMAN LLC
1100 Vermont Ave.    University of Notre Dame 2800 Ponce De Leon
NW Fl. 12                                     Blvd., Suite 1100
Washington, DC 20005 Christopher A. Seeger    Coral Gables, FL 33134
                     SEEGER WEISS LLP         ack@kellerpostman.com
David Cooper         55 Challenger Rd. 6th Fl. (312) 741-5222
QUINN EMANUEL        Ridgefield Park, NJ 07660
URQUHART & SULLIVAN
LLP                  Michael Sacchet         Bryan F. Aylstock
51 Madison Ave. 22nd Fl. CIRESI CONLIN LLP   AYLSTOCK WITKIN KREIS
New York, NY 10010   225 S. 6th St. Suite 4600 & OVERHOLTZ, PLLC
                     Minneapolis, MN 55402    17 E. Main St. Suite 200
                                              Pensacola, FL 32502

57

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,970 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: June 27, 2022

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

On June 27, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiffs-Appellees*